UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELLY M. REPKE,

      Plaintiff,                     Civil Action No. 16-14256

          v.                   District Judge Arthur J. Tarnow
                                    Magistrate Judge R. Steven Whalen

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

     Plaintiff Kelly M. Repke ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging Defendant Commissioner's ("Defendant's") cessation of Supplemental Security Income under the Social Security Act. The parties have filed cross-motions for summary judgment. Both motions have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment [Docket #14] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Docket #13] be DENIED.

## PROCEDURAL HISTORY

On March 8, 2006, Plaintiff applied for Supplemental Security Income ("SSI"), alleging disability as of June 2, 2003  (Tr. 163).  On March 6, 2013, Plaintiff was found disabled as of February 15, 2006 (Tr. 13).   On February 7, 2013, the SSA found that Plaintiff was no longer disabled as of the same day (Tr. 13).

Plaintiff requested an administrative hearing, held on May 11, 2015 (Tr. 31). Administrative Law Judge ("ALJ") Mara-Louise Anzalone presided.  Plaintiff, unrepresented by counsel, testified (Tr. 38-53), as did Vocational Expert ("VE") Michelle Ross (Tr. 53-57). On November 17, 2015, ALJ Anzalone found that as of February 7, 2013, Plaintiff was capable of unskilled work at all exertional levels (Tr. 17, 24).

On October 27, 2016, the Appeals Council denied review (Tr. 1-3).  Plaintiff filed the present action on December 6, 2016.

## BACKGROUND FACTS

Plaintiff, born September 13, 1977, was 35 at the time of the February 7, 2013  finding of medical improvement by the SSA (Tr. 13, 163).  She alleges ongoing disability due to multiple psychological conditions (Tr. 15).

### A.  Plaintiff's Testimony

Plaintiff, unrepresented by counsel, offered the following testimony:

After experiencing temporary improvements in her mental condition, her condition would again worsen, characterized by frequent crying, fatigue, irritability, and verbal and physical abuse (Tr. 38).  She had two sons, 16 and 10 (Tr. 39).  The 16-year-old lived with Plaintiff's mother because Plaintiff was unable to get along with him (Tr. 39).  The 10-year-old lived with Plaintiff (Tr. 39).  She attended her younger son's parent-teacher conferences and helped him with his homework to the best of her ability (Tr. 39).  She sent him to school early three days a week for math tutoring (Tr. 40).

Plaintiff had been sober for eight years (Tr. 40).  In the same period, her relationship with her parents and other family members had improved (Tr. 40-41).  She used psychotropic medication but currently declined to take Abilify due to the side effect of weight gain (Tr. 41).  She reported good results from the prescribed medications when she was compliant, but was prone to go off her medication and miss appointments (Tr. 42).

Plaintiff worked briefly at Meijer but was discharged after failing to keep track of her cash drawer at the service desk (Tr. 42).  She spent her leisure time sleeping (Tr. 43).  She was also terminated from a job at Subway after stealing money from a cash drawer (Tr. 43).  She went to jail after failing to pay fines for retail fraud (Tr. 44).  Afterward, she continued to steal but had not been caught (Tr. 45).  She was prone to mood swings characterized by "three up days, but four down days" (Tr. 43).

At the time of the hearing, Plaintiff had begun therapy and had perfect attendance (Tr. 45). However, her counseling sessions seemed like "a conversation with my friend" and did not improve her mental state (Tr. 45). Due to financial constraints, Plaintiff did not attend social or sporting events but enjoyed dining out with her boyfriend (Tr. 45). She was unable to work because of her lack of education, her inability to use a computer, the fact she did not drive, childcare responsibilities, and her tendency to "flip out" (Tr. 46). "Flipping out" included being verbally abusive, throwing a brick at her boyfriend's new truck after he was late for dinner, and smashing a window of his house (Tr. 46-47). She had recently received a diagnosis of "intermittent explosive disorder" ("IED") (Tr. 48). Her failure to participate in therapy was attributable to her psychological condition (Tr. 50). She experienced Obsessive Compulsive Disorder ("OCD") and during a gathering at her house for Mother's Day had felt compelled to wipe away fingerprints every time a guest touched something (Tr. 52). Due to OCD, she vacuumed "five or six times a day" (Tr. 52). She did not experience difficulty staying sober, noting that her substance abuse ended when she ended her relationship with a "user" (Tr. 47).

## B. Medical Evidence

### 1. Evidence From On or Before the February 7, 2013 Cessation of Benefits

In May, 2006, Sally J. Glowicki, M.A. performed a psychological evaluation on behalf of the SSA, noting Plaintiff's report of worsening bipolar disorder, OCD, and Attention Deficit Disorder ("ADD") (Tr. 295). Plaintiff reported taking Trileptal, Abilify, and Xanax

(Tr. 295).   She reported treatment for substance abuse but denied psychiatric inpatient treatment (Tr. 296).   She reported that she spent money impulsively but was able to care for the needs of her 7-year-old and 16-month-old sons (Tr. 297).   Glowicki noted that Plaintiff's claim that she performed all of her household chores within an hour every day contradicted her later reported that due to OCD, she vacuumed, washed steps, and cleaned multiple times a day (Tr. 298).   Glowicki found the presence of affective and personality disorders with "financial, occupational, social, and interpersonal problems" (Tr. 300).   She assigned Plaintiff a GAF of 48, opining that Plaintiff would not be able to manage her own benefit funds[1]   (Tr. 300).   In October, 2006, psychiatrist Mukesh Lathia, M.D. noted Plaintiff's report of mood swings with good results from psychotropic medication (Tr. 303).   He assigned Plaintiff a GAF of 40-45[2] (Tr. 304).   Dr. Lathia's December, 2006 records state that Plaintiff was referred for inpatient psychiatric treatment after attacking the former girlfriend of her former boyfriend (Tr. 306).   She tested positive for benzodiazepine, cocaine, and marijuana (Tr. 306).   In January, 2007 Dr. Lathia's staff approved an increased dose of Trileptal (Tr. 305).

---

[1]

A GAF score of 41–50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (4th ed.2000)("*DSM-IV-TR*").

[2]

A GAF score of 31 to 40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *DSM–IV–TR*, 34.

November, 2011 treating records note a diagnosis of depression but normal orientation and good judgment (Tr. 362-363).   From January through June, 2012, Plaintiff denied symptoms of Hepatitis C (Tr. 311, 313, 322, 324, 367, 383).   May, 2012 records note a good mood despite a recent house fire that had destroyed most of Plaintiff's belongings (Tr. 322).   July, 2012 records note a good mood and full orientation (Tr. 326).   August, 2012 records note that the condition of depression was stable (Tr. 329, 390).   November and December, 2012 records note a good mood and full orientation (Tr. 395, 397).

In January, 2013, Michael Brady, Ph.D. performed a consultative psychological evaluation on behalf of the SSA, noting Plaintiff's report that she took a bus to the evaluation because she lost her license due to unpaid tickets (Tr. 415).   She reported that due to OCD, she cleaned her house "constantly, day and night" and was irritable and easily antagonized (Tr. 415).   She reported arrests for retail fraud, unpaid fines, marijuana possession, and driving on a suspended license (Tr. 416).   Dr. Brady observed that Plaintiff was in contact with reality and exhibited good grooming and a cooperative attitude (Tr. 416).   She did not exhibit memory problems (Tr. 417).   Dr. Brady, noting a diagnosis of Major Depressive Disorder, assigned Plaintiff a GAF of 65[3] (Tr. 418).   He found that she could manage her benefit funds (Tr. 418).

---

[3]GAF scores in the range of 61 to 70 suggest "some mild symptoms or some difficulty in social, occupational, or school functioning." *DSM–IV–TR* at 34.

Just two days before the cessation of benefits, Judy Strait, Psy.D. performed a non-examining Psychiatric Review Technique, finding that due to affective and personality disorders (Tr. 420, 423, 427), Plaintiff experienced mild restriction in activities of daily living and moderate restriction in social functioning and concentration, persistence, or pace (Tr. 430). Dr. Strait also performed a Mental Residual Functional Capacity Assessment, finding moderate limitation in the ability to understand, remember, and carry out detailed instructions; maintain concentration for extended periods; work in coordination with others without distraction; complete a workweek without psychologically-based interruption; work with the general public or coworkers; accept criticism or instruction; and respond appropriately to workplace changes (Tr. 435). Dr. Strait noted that Plaintiff had not received active treatment for bipolar disorder in the past year and was able to take care of her children, perform household chores, cook, and take public transportation (Tr. 436). Dr. Strait cited the consultative examination results noting good grooming and memory (Tr. 436).

Two days later, Dale Blum, M.D. performed a Physical Residual Functional Capacity Assessment, finding that Plaintiff could lift 20 pounds occasionally and 10 frequently; sit, stand, or walk for six hours in an eight-hour workday; and push and pull without limitation (Tr. 439). Plaintiff was limited to frequent balancing and kneeling and occasional climbing, stooping, crouching, and crawling (Tr. 440). He found the absence of manipulative, visual, communicative, and environmental limitations (Tr. 441-442). He noted that the Hepatitis C treatment had been completed successfully (Tr. 443).

## 2.  Evidence Post-Dating the Cessation of Benefits

In April, 2013, Robert Nelson, M.D. completed another Physical Residual Functional Capacity Assessment, making findings identical to Dr. Blum's February, 2013 findings (Tr. 455-461).  The same month, Ron Marshall, Ph.D. completed a second Psychiatric Review Technique and Mental Residual Functional Capacity Assessment, making findings identical to the February, 2013 findings by Dr. Strait (Tr. 462, 465, 469, 472, 476-477).  Dr. Marshall concluded that Plaintiff could "do rote" and "follow and retain simple instructions" with "brief interactions with others" (Tr. 478).

Psychological intake records by McLaren Bay Psychiatric Associates ("McLaren") from the same month state that Plaintiff sought treatment for the purpose of maintaining focus and going back to school (Tr. 480, 488).  She reported housing problems, past trauma, anxiety, anger, and depression (Tr. 481).  She stated that she was not able to manage money well but was able to sustain relationships with two boyfriends (Tr. 495-496, 547-548).  She reported that she perceived other people's houses as "dirty" and that she was unable to "ride in some people's cars" due to OCD (Tr. 495).  She reported a history of retail fraud and that she could not "help it" because it was "a sickness" (Tr. 495).  Intake records note a neat appearance and average intelligence (Tr. 497).  Plaintiff was assigned a GAF of 50 due to depression, cannabis abuse, kleptomania, a history of Hepatitis C (Tr. 499, 553).  She exhibited a normal memory and orientation (Tr. 500).  She expressed interest in becoming a medical assistant but was "unsure if or when she [would] begin to attend" (Tr. 506).  She

reported "several friends" and "close relationships with family members" (Tr. 506). Therapy records from the following month note the presence of an impulse control disorder (Tr. 559). Plaintiff reported that she felt "a little bit more motivated" with the use of Zoloft (Tr. 561). She reported daily marijuana use (Tr. 561). She exhibited a normal thought process (Tr. 562). A July, 2013 medication review notes unremarkable behavior (Tr. 566). Treating records note pending assault charges (Tr. 567).

Plaintiff was discharged from McLaren in September, 2013 after failing to attend sessions (Tr. 504, 534). October records by Bay Arenac Behavioral Health ("Bay") note that Plaintiff continued to self-medicate with marijuana (Tr. 572). June, 2015 treating records note appropriate dress and grooming with good judgment (Tr. 576). Plaintiff reported that she still felt "crappy and still depressed," but denied suicidal ideation (Tr. 576).

Plaintiff restarted treatment in February, 2015 (Tr. 532). She expressed a desire to begin school the following year (Tr. 522, 532). In July, 2015, Mark Zaroff, Ph.D. performed a psychological consultative examination on behalf of the SSA, noting Plaintiff's report of "severe mood swings" (Tr. 511). Plaintiff reported, for example, that the sound of her son "crunching potato chips too loudly" would make her angry for an entire day (Tr. 511). She reported that she had received treatment consistently since November, 2014 but admitted to ongoing monthly marijuana use (Tr. 511-512). She reported that she cleaned her home obsessively (Tr. 513).

Dr. Zaroff noted that Plaintiff was fully oriented (Tr. 514-515).  He noted diagnoses of

major depressive disorder, IED, kleptomania, OCD, and cannabis use (Tr. 516).  He concluded

that she was capable of handing "moderately complex information and multiple step tasks, but

"emotionally" would be "likely to have a difficult time maintaining psychiatric stability

through a typical work day and work week and may at times be quite reactive to situations on

the job" (Tr. 517).  He found that she experienced moderate difficulties making judgments

regarding complex decisions and marked limitation in interacting with the public, supervisors,

and coworkers and adapting to workplace changes (Tr. 519).

## C.  Vocational Expert Testimony

VE Ross found that Plaintiff had no past relevant work(Tr. 54).  The ALJ posed the

following set of limitations to the VE, describing a hypothetical individual of Plaintiff's age

and education:

> [T]his individual would be limited to less than a full range of light [work].[4]
> She could occasionally climb ramps and stairs, occasionally climb ladders,
> ropes and scaffolds, frequently balance, occasionally stoop, frequently kneel
> and occasionally crouch and crawl.  She . . . would be limited to simple,
> routine tasks, she could interact with supervisors frequently, coworkers

---

[4]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds
at a time and occasionally lifting or carrying articles like docket files, ledgers, and small
tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50
pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and
that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with
frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires
"lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of
objects weighing 50 pounds or more. § 404.1567(e).

occasionally and the public occasionally.  Would there be any work for such
an individual? (Tr. 54).

The VE testified that given the above limitations, the individual could perform the jobs of

machine tender (110,000 in the national economy); light assembler (250,000); and packer

(122,000) (Tr. 54).  The VE testified that if the same individual were additionally limited to

only occasional contact with supervisors and "no contact with coworkers or the public," the

light assembler position would be eliminated but the other two positions would be available

(Tr. 55).  The VE found that the amended limitations would also allow for the position of line

attendant (125,000) (Tr. 55).    However, the VE testified that if the same individual also

experienced "mood swings, anger and aggression" resulting in one workplace argument a

week;" engaged in workplace theft or embezzlement once a month; or, were off task for at

least 20 percent of an eight-hour workday, all work would be precluded (Tr. 56-57).  The VE

stated that her testimony was consistent with the information found in the *Dictionary of*

*Occupational Titles* ("*DOT*") (Tr. 56).

### D.    The ALJ's Decision

ALJ Anzalone noted that at the "comparison point decision" ("CPD") of March 6,

2007, Plaintiff was found  disabled due to depression (Tr. 14-15).  The ALJ found that as

February 7, 2013, Plaintiff experienced the severe impairments of "major depressive disorder,

personality disorder, IED, kleptomania, OCD, cannabis use disorder, and alcohol use disorder

but that none of the impairments met or medically equaled the severity of an impairment listed

in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 15).  The ALJ found that as of February 7,

2013, Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 15-16). The ALJ found that as of the same date, Plaintiff had the Residual Functional Capacity ("RFC") for work at all residual levels with the following non-exertional limitations:

> [S]he is limited to performing simple and routine tasks. She can frequently interact with supervisors and occasionally interact with coworkers and the public (Tr. 17).

Citing the VE's testimony, the ALJ found that Plaintiff could perform the jobs of machine tender, assembler, and packager (Tr. 24, 54-55).

The ALJ discounted Plaintiff's allegations of continued disability (Tr. 20). The ALJ noted that Plaintiff "stopped all mental health treatment in 2008 shortly after she was awarded [SSI]" (Tr. 20). The ALJ noted a December, 2012 finding of stable mood but when Plaintiff's entitlement to SSI was reviewed the following month, "she again began alleging significant psychological symptoms" (Tr. 20). The ALJ noted that Plaintiff's testimony that she had been sober for many years was contradicted by treating records showing "the ongoing use of alcohol and marijuana" (Tr. 20). She noted further that while Plaintiff stated in April, 2013 she was unable to ride in other peoples' cars due to OCD, she could ride in her boyfriend's car as of February, 2015 and admitted that she was able to take public transportation (Tr. 20). The ALJ concluded that Plaintiff's ability to cook, clean, take care of her children, and use public transportation supported the conclusion that she was capable of "at least simple tasks" (Tr. 22).

-12-

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR CESSATION OF BENEFITS CLAIMS

In determining whether an individual continues to be disabled, the ALJ employs a eight-step sequential analysis in regard to DIB claims and a seven-step analysis for SSI. See 20 C.F.R. § § 404.1594, 416.994.  Steps two through eight of a DIB claim are identical to

the seven-step process used in SSI claims.  *See* § § 404.1594, 416.994.  At Step One in a DIB

claim, the ALJ determines whether the individual is engaging in substantial gainful activity.

A finding that the claimant is performing substantial gainful activity results in a finding of

non-disability.   At Step Two (the first consideration in an SSI claim) the ALJ considers

whether the individual had an impairment or combination of impairments which meets or

equals the severity of a listed impairment.  If the ALJ finds such impairment(s), the inquiry

continues. At Step Three, the ALJ determines whether there has been medical improvement.

At Step Four, the ALJ considers whether  the medical improvement relates to the individual's

ability to perform work.  At Step Five, the ALJ determines if there has been no medical

improvement or the medical improvement is not related to the individual's ability to perform

work.  At Step Six, the ALJ determines whether the individual's current impairments are

severe.   The absence of a severe impairment directs a non-disability finding. At Step Seven,

the ALJ determines whether the claimant's abilities allow him to perform his past relevant

work.  A finding that he can perform such work results in a non-disability finding.  At Step

Eight, the ALJ determines whether the individual can perform other work in light of his or

her age, education, work experience and RFC. A finding that he is capable of performing

other work results in a non-disability finding.

In contrast to an initial disability determination, "the ultimate burden of proof lies with

the Commissioner in termination proceedings." *Kennedy v. Astrue,* 247 Fed.Appx. 761, 765,

2007 WL 2669153, *4 (6th Cir. September 7, 2007)(*citing Griego v. Sullivan,* 940 F.2d 942,

944 (5th Cir.1991)). In a cessation of benefits case, "the central question is whether the claimant's medical impairments have improved to the point where [s/he] is able to perform substantial gainful activity." *Kennedy* at 764; 42 U.S.C. § 423(f)(1). A "medical improvement" is defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). A determination of medical improvement must be supported by an improvement "in the symptoms, signs and/or laboratory findings associated with your impairment(s)." *Id.*; *Kennedy* at 765.

## ANALYSIS

### A. The RFC

Plaintiff, disputing the finding that her disability ended on February 7, 2013, argues first that Residual Functional Capacity Assessment ("RFC") found in the administrative opinion (Tr. 17) does not account for her full degree of limitation resulting from multiple psychological conditions. *Plaintiff's Brief,* 7-15, *Docket #13,* Pg ID 637. Plaintiff argues that the RFC for "simple and routine tasks" with frequent interaction with supervisors and occasional interaction "with coworkers and the public" does not reflect the ALJ's finding that she experienced depression, personality disorder, IED, kleptomania, OCD, cannabis use disorder, and alcohol use disorder. *Id.* (*citing* Tr. 15).

"RFC is what an individual can still do despite his or her limitations." SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996). "The RFC assessment must include a narrative

-15-

discussion describing how the evidence supports each conclusion, citing specific medical facts" including objective findings, non-medical evidence, and activities of daily living. *Id.* at 7.  The analysis must include psychological limitations.  20 C.F.R. § 404.1545.  The ALJ must consider how the non-exertional limitations effect the ability to "understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8p at *6.

As a threshold matter, Plaintiff's argument that she does not possess the capability for frequent contact with supervisors and occasional contact with the public and coworkers (Tr. 17) is mooted by the vocational testimony that an individual additionally limited to *no* contact with the public and coworkers and only occasional contact with supervisors could nonetheless perform a significant number of jobs (357,000) in the national economy (Tr. 54-55).  Thus, even assuming that the RFC for frequent contact with supervisors and occasional contact the public and frequent contact with supervisors is not supported by the transcript, a remand is not warranted.  *Murray v. Commissioner of Social Security*, 2016 WL 80668, at *5 (W.D.Mich. January 7, 2016).  In *Murray*, the Court  declined to remand despite the lack of evidence supporting the RFC for semiskilled work, finding that the VE's additional testimony that the claimant could perform a significant number of unskilled jobs constituted substantial evidence in support of the conclusion that the claimant could perform other work. *Id.*  "'No principle of administrative law or common sense requires [a reviewing court] to

remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.'" *Id.* (*citing Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989))(punctuation in original). Likewise here, revising the RFC to *no* contact with the public and coworkers and only occasional with supervisors would not change the result. *See NLRB v. Wyman–Gordon*, 394 U.S. 759, 766 fn. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969))(plurality opinion)("where remand would be an idle and useless formality, courts are not required to convert judicial review of agency action into a ping-pong game").

Aside from the vocational testimony supporting a more restrictive RFC, the ALJ's discussions and conclusions regarding the medical evidence are well supported and should not be disturbed. Plaintiff cites May, 2015 counseling records noting irritability, low energy, and short-term memory problems (Tr. 561). However, the ALJ acknowledged the 2015 records but observed that treating notes mostly recorded Plaintiff's own allegations of psychological limitation (Tr. 19). Even assuming that the counselor recitation of Plaintiff's report could be considered a treating "opinion," the ALJ did not err in declining to adopt the evidence based exclusively on subjective claims. *See Poe v. CSS*, 342 F. App'x 149, 156, 2009 WL 2514058 at *6-7 (6th Cir. August 18, 2009)(treating opinion "not entitled to deference" because it was based on Poe's subjective complaints, rather than objective medical data."). The ALJ noted that while the record supported "the existence of multiple mental diagnoses, it does not support that [Plaintiff's] symptoms [were] disabling" (Tr. 20). The ALJ observed that Plaintiff stopped all mental health treatment after being awarded

benefits (Tr. 20). The ALJ cited Plaintiff's 2011 report to a treating physician that she had not experienced depression for five years (Tr. 20). The ALJ found that Plaintiff's "admitted activities . . . grossly inconsistent with the alleged severity of her symptoms," noting her ability to raise two children, perform her own household chores, shop, use public transportation, go out to dinner, attend concerts, host holiday gatherings, swim, camp, and "go four-wheeling" (Tr. 21). She noted that Plaintiff's "primary obstacles to employment" were related to her criminal record rather than "mental diagnoses" (Tr. 21).

Aside from the evidence strongly supporting the non-disability findings, the ALJ also provided an adequate discussion for the weight accorded non-treating sources Drs. Strait, Marshal, and Brady.[5] The ALJ accorded Drs. Strait and Marshal's opinions "significant weight" (Tr. 21). The ALJ acknowledged Dr. Strait's finding that Plaintiff "might not work well with the general public and might work best alone or in a small familiar group" (Tr. 21). While the ALJ did not directly address Dr. Marshall's restriction to "brief interactions with others" which suggests less than occasional contact with the public and coworkers and frequent contact with supervisors (Tr. 478), she went on to state that although Plaintiff "alleges somewhat extreme social limitations, the record shows that she is able to socialize appropriately and interact with others as needed" (Tr. 21). Aside from the "significant

---

[5]While Plaintiff also argues that the ALJ's conclusions regarding Dr. Zaroff's consultative opinion are not well supported or articulated, *Plaintiff's Brief* at 13-14, her contentions will be addressed along with her second argument for remand pertaining solely to Dr. Zaroff's findings.

weight" accorded the two non-treating opinions, she found other evidence to support the finding that Plaintiff was capable of interacting with others on an occasional (public and coworkers) and frequent (supervisors) basis (Tr. 21-22).   Contrary to Plaintiff's contention, these findings are neither hard to follow nor internally inconsistent.

The ALJ's discussion and conclusions regarding Dr. Brady's findings are otherwise well supported and explained.   The ALJ noted Dr. Brady's finding that Plaintiff had only a fair ability to relate to others, "somewhat impaired" concentration, and possible psychologically-based distractions limiting "effectiveness and performance" (Tr. 21).   The ALJ acknowledged that Dr. Brady's findings were "consistent with his own observations" but noted that his generalized finding that Plaintiff would have problems dealing with workplace stress and would work at a slowed pace was unaccompanied by an evaluation of Plaintiff's "functional limitations" (Tr. 21).   While Plaintiff argues that Dr. Brady performed "a fairly detailed psychological evaluation," the ALJ noted correctly that the findings that Plaintiff "may often be distracted" and "will likely be limited and slowed" (Tr. 418) were not quantified by a Residual Functional Capacity Assessment or any other finding regarding the degree of Plaintiff's psychologically-based work restrictions.   Accordingly, the ALJ's conclusion regarding these treating, consultative, and non-examining evidence should remain undisturbed.

### B.  Dr. Zaroff's Findings

Plaintiff contends that the ALJ's rejection of Dr. Zaroff's July, 2015 finding of marked limitation in interacting with the public, supervisors, and coworkers and in the ability to respond to changes in routine was not well articulated.   Plaintiff's asserts that "[t]here is no logical bridge" between the ALJ rejection of the "marked" findings and the ALJ's statement that they were "'inconsistent with the record as a whole.'" *Plaintiff's Brief* at 13-14 (*citing* Tr. 22).  Plaintiff also argues that because the transcript did not contain an assessment of her workplace limitations by a treating source, the ALJ's analysis of Dr. Zaroff's opinion was subject to the more stringent articulation requirements for a "treating source" opinion under 20 C.F.R. § 1527(c)(1-6).  *Id.* at 14-16 (*citing Albaugh v. CSS,* 2015 WL 1120316, at *7 (E.D.Mich. March 11, 2015)).   Further, Plaintiff  contends that the rejection of Dr. Zaroff's marked findings is unreconciled with the ALJ's acknowledgment of the diagnoses of kleptomania and IED.  *Id.* at 14.

As an initial matter, because Dr. Zaroff was a one-time examining rather than treating source, his opinion was "entitled to no special degree of deference." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)(*citing Atterberry v. HHS*, 871 F.2d 567, 572 (6th Cir. 1989)). Nonetheless, the ALJ discussed Zaroff's findings at length before providing the following rationale for adopting some of his findings but not others:

> I accord significant weight to Dr. Zaroff's opinion that the claimant is not limited at all in her ability to understand, remember, and carry out simple instructions.  However, I accord little weight to the [the finding of marked limitations in interacting with public/supervisors/coworkers, adapting to

workplace changes] because it is inconsistent with the record as a whole. Although the claimant alleges experiencing severe mood swings that could affect her ability to perform consistently the record shows that her symptoms are improved significantly with treatment and her mood swings are not as severe as alleged (Tr. 22).

Plaintiff's reliance on *Albaugh, supra,* in support of her contention that the ALJ did not provide sufficiently specific reasons for the rejection of the consultative examiner's findings is unavailing. In *Albaugh,* the Court found that the ALJ's rejection of the consultative source's opinion on the basis that "the record, as described above, does not support the extent of the assessed limitations in interactions with others and ability to handle work pressures" was impermissibly vague, noting that it was unclear where the rationale for the rejection of the consultative source could be found in the previous 16 pages of the determination *Id.* at 7. In this case, the ALJ's rationale, (alluding directly to the earlier credibility determination) is clearer: She acknowledged that Dr. Zaroff appeared to have accepted the allegations of mood swings, but referred back to her earlier conclusion that Plaintiff's claims of disability-level mood swings were not credible (Tr. 22). The one-page credibility determination noted that Plaintiff's claims of disability were undermined by the fact that she stopped mental health treatment altogether shortly after receiving the 2008 award of SSI (Tr. 20). The ALJ cited Plaintiff's 2011 report to a treating source that she had not experienced depression in five years, observing that Plaintiff "again began alleging significant psychological symptoms" in 2013 "when it came time" for the SSA to review her disability status (Tr. 20). The ALJ cited Plaintiff's acknowledgment that she experienced

-21-

reduced symptoms while taking psychotropic medication (Tr. 20).  The ALJ noted that Plaintiff's testimony that she had been sober for at least seven years stood at odds with her report to treating sources that she continued to overuse alcohol and used marijuana on a regular basis (Tr. 20).  She found that Plaintiff's allegations of OCD were undermined by her use of public transportation and the ability to ride in her boyfriend's car and attend concerts (Tr. 21).   The ALJ noted that Plaintiff's allegations of "uncontrolled mood swings" stood at odds with the ability to maintain multiple romantic relationships, take care of her children, host family events, swim, camp, and dine out (Tr. 21).  The ALJ noted that Plaintiff's allegation that her mental condition precluded employment contradicted her earlier claim that the primary obstacle to employment was her criminal background (Tr. 21).  While Plaintiff argues that the RFC fails to acknowledge the conditions of impulsivity, kleptomania, and IED, *Plaintiff's Brief* at 14, the ALJ observed that "although [Plaintiff] alleges somewhat extreme social limitations, the record shows that she is able to socialize appropriately and interact with others as needed" (Tr. 21).   Plaintiff's claim that the severe impairments of kleptomania and IED required further discussion or explicit mention in the RFC should be rejected.  "A claimant's severe impairment may or may not affect his or her functional capacity to do work. One does not necessarily establish the other." *Griffeth v. Commissioner of Social Sec.,* 217 Fed.Appx. 425, 429, 2007 WL 444808, at *4 (February 9, 2007).  The ALJ acknowledged diagnoses of kleptomania and IED but noted that the medical evidence, daily activities, and testimony supported the finding that the psychological conditions were

non-disabling.  My own review of the record shows that while Plaintiff recounted instances of anti-social behavior to treating and consultative sources, the same records show a consistently cooperative and appropriate demeanor.  It also bears repeating that even if Plaintiff were found to be limited to *no* contact with the public and coworkers and only occasional contact with supervisors, she would still be capable of a significant number of jobs.  *See* Section A., *above.*

The ALJ's finding that Plaintiff's activities were "grossly inconsistent with the alleged severity of [] symptoms" is also consistent with my own review of the record (Tr. 20).  Treating records for other conditions starting in November, 2011 note consistently normal mood, orientation, and judgment (Tr. 322, 326, 329, 362-363, 390).  Indeed, treating records from even one month before the disability status review began note a good mood and full orientation (Tr. 395, 397).  The ALJ's finding that Plaintiff did not allege extreme psychological limitation until the time of SSI review is amply supported by the record.

Based on a review of this record as a whole, I find that the Commissioner has met her burden to show that Plaintiff's disability ended as of February 7, 2013.  *Kennedy, supra,* 247 Fed.Appx.  at 765, 2007 WL 2669153, *4; 42 U.S.C. § 423(f)(1).

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #14] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Docket #13] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: December 27, 2017                s/R. Steven Whalen
                                        R. STEVEN WHALEN
                                        UNITED STATES MAGISTRATE
                                        JUDGE

-24-

## CERTIFICATE OF SERVICE

I hereby certify on December 27, 2017 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically.  I hereby certify that a copy of this paper was mailed to non-registered ECF participants on December 27, 2017.

s/Carolyn M. Ciesla
Case Manager for the
Honorable R. Steven Whalen